FILED

2025 FEB 20 PM 3: 33

CIVIL
DISTRICT COURT

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

CASE NO. 2025-22                                  SECTION "I"

**PRYTANIA MEDIA LLC; PRYTANIA MEDIA CORP;
ANNIE STRAIN; and WILLIAM ("JEFF") STRAIN**

**VERSUS**

**NETEASE, INC.;
NETEASE INTERACTIVE ENTERTAINMENT PTE. LTD.;
NETEASE INFORMATION TECHNOLOGY CORPORATION;
HAN CHENGLIN; and CROP CIRCLE GAMES CORP**



**JURY**

FILED: _____          _____
                                         **DEPUTY CLERK**

CHELSEY RICHARD NAPOLEON
CLERK CIVIL DISTRICT COURT

**AMENDED, RESTATED, AND VERIFIED
PETITION FOR INJUNCTIVE RELIEF AND DAMAGES**

NEW ORLEANS, LA 70112
504 407-0000

Receipt Number     990007
Cashier            igster
Register           CDU Cash Register 7

Case Number        2025-00022

Grand Total        $ 952.00
Amount Received    $952.00
Balance Due        $0.00
Over Payment       $0.00

Payment/Transaction List
Credit Card #  03479... $952.00

Respectfully submitted,

Item          Charged      Paid       Bal
              .50     $444.50    $0.00
              $30.50   $30.50    $0.00
              $780.00  $780.00   $0.00

STEVEN F. GRIFFITH, JR. (27232)
MATTHEW S. CHESTER (36411)
RILEY T. SVIKHART (40647)
SOPHIA R. CEFOLIA (41188)
**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone:  (504) 566-5200
Facsimile:  (504) 636-4000
Email:    sgriffith@bakerdonelson.com
          mchester@bakerdonelson.com
          rsvikhart@bakerdonelson.com
          scefolia@bakerdonelson.com

**ATTORNEYS FOR ALL PLAINTIFFS**

VERIFIED

# TABLE OF CONTENTS

Introductory Statement .................................................................................... 1

Procedural Introduction ................................................................................. 2

I.    Parties ..................................................................................................... 2

      A.    Plaintiffs ................................................................................. 2

      B.    Defendants .............................................................................. 3

      C.    No Diversity of Citizenship ................................................... 5

II.    Jurisdiction and Venue ........................................................................... 5

      A.    Jurisdiction ............................................................................. 5

      B.    Venue ..................................................................................... 6

      C.    Notice to the Attorney General for the State of Louisiana ............. 7

III.    Background Facts – The Video Game Industry ...................................... 8

      A.    The Industry as a Whole ........................................................ 8

      B.    Prytania Media Studios .......................................................... 9

      C.    Crop Circle Games ................................................................. 10

      D.    NetEase ................................................................................. 10

IV.    NetEase's Wrongdoing ............................................................................ 12

      A.    NetEase Invests in Crop Circle and Gains Some Control and Access ........... 12

      B.    Questions Arise Regarding NetEase's Compliance with the Law ................. 13

            1.    Committee on Foreign Investment in the United States ................... 13

            2.    Prytania Media's Questions Regarding NetEase's Compliance ....... 19

            3.    On Information and Belief, NetEase's Intention for Deployment Of Funds Throughout the United States ................................................. 21

            4.    On Information and Belief, the Plan for NetEase's Executives to Emigrate to the United States ....................................................... 22

      C.    NetEase's Response ............................................................... 22

      D.    Corroboration From Third Parties ........................................... 23

      E.    Admissions By NetEase's Representative on the Crop Circle Board ............. 24

|        | F.  | The Market for Funding Dries Up; Plaintiffs Suffer the Harm | 26 |
| V.     | Damages | | 28 |
|        | A.  | Damage to Prytania Media | 28 |
|        |     | 1.  Pre-Dispute Valuations | 28 |
|        |     | 2.  Today's Value | 29 |
|        |     | 3.  Future Value | 30 |
|        | B.  | Damage to Annie and Jeff Strain | 30 |
|        | C.  | Trebling of Damages | 30 |
| VI.    | Counts Alleged | | 31 |
|        | COUNT I:   | DEFAMATION | 31 |
|        | COUNT II:  | UNFAIR TRADE PRACTICES | 33 |
|        | COUNT III: | TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS | 35 |
|        | COUNT IV:  | NEGLIGENCE UNDER ARTICLE 2315 | 36 |
| Jury Demand | | | 37 |
| Prayer for Relief | | | 37 |
| Verifications | | | 39 |

## AMENDED RESTATED, AND VERIFIED
## PETITION FOR DAMAGES AND INJUNCTIVE RELIEF

**NOW INTO COURT**, through undersigned counsel, come Plaintiffs, Prytania Media

LLC, Prytania Media Corp (collectively, "Prytania Media"), Annie Strain, and William ("Jeff")

Strain, (collectively "Plaintiffs"), and, for their Amended, Restated, and Verified Petition for

Injunctive Relief and Damages, with a full reservation of rights, aver as follows:

### Introductory Statement

1.

This case is about the destruction of the careers of two gaming industry veterans and their

company by a Chinese entity seeking to avoid compliance with United States law. Annie and Jeff

Strain formed Prytania Media, a Louisiana-based video game company focused on launching

subsidiary game development studios to create innovative games under their unified brand. Its

unique name was inspired by the location of the company, but also, a desire to bring the gaming

industry and its economic opportunity to Louisiana. Now, a few short years after its founding, the

company and all its game studios are all inactive due to the misconduct of the Defendants.

2.

One of Prytania Media's game development studios, Crop Circle Games Corp ("Crop

Circle Games"), partnered with NetEase, Inc. ("NetEase"), a large multi-media company based in

China. What was supposed to be a mutually beneficial relationship was eventually overshadowed

by worries over NetEase's United States regulatory compliance, as well as a contraction in the

gaming industry. After repeated requests from Annie and Jeff Strain that NetEase confirm it was

following United States foreign investment laws, NetEase took action to silence their partners.

3.

For its own benefit, NetEase caused defamatory rumors to run rife in the gaming

investment community during a sensitive time in the industry. These rumors prevented Crop

Circle Games' success and destroyed the portfolio and its founders' reputations in the process.

With knowledge of the statements' falsity, NetEase accused Prytania Media of fraudulently

mismanaging Crop Circle Games' finances. As a result, several critical potential investors and

partners in Prytania Media and its subsidiaries, including in particular Crop Circle Games, pulled out, and what was once a $344,000,000 venture is now worth nearly nothing.

## Procedural Introduction

3.

On January 3, 2025, Prytania Media and the Strains filed their Original Petition for Damages against NetEase, Inc.; Han Chenglin; and Crop Circle Games Corp.

4.

Following the filing, Prytania Media and the Strains continued to investigate the claims at issue in the Petition for Damages.

5.

During the interim period between the filing of the Petition and this Amended Petition, the Plaintiffs also provided the notice required of La. R.S. 51:1409(B) to the Attorney General for the State of Louisiana.

6.

Now, pursuant to Article 1152 of the Louisiana Code of Civil Procedure, Prytania Media and the Strains file their Amended, Restated, and Verified Petition for Injunctive Relief and Damages on behalf of themselves, as well as against the original and new Defendants named herein.

## I.      Parties

### A.      Plaintiffs

7.

Plaintiff Prytania Media LLC is a Delaware limited liability company 100% owned by Prytania Media Corp. Prytania Media is an independent and family-owned, privately held portfolio of curated game development studios. Prytania Media LLC wholly owns every Prytania Media subsidiary except Crop Circle Games, in which it holds a majority share of ownership.

8.

Plaintiff Prytania Media Corp is a Delaware corporation with its principal place of business in Louisiana. Prytania Media Corp wholly owns Prytania Media LLC and manages Prytania Media's game development studios.

9.

Plaintiff Annie Strain is a natural person of the full age of majority domiciled in Louisiana. Ms. Strain is an owner, officer, and manager of the Prytania Media entities.

10.

Plaintiff Jeff Strain is a natural person of the full age of majority domiciled in Louisiana. Mr. Strain is an owner, officer, and manager of the Prytania Media entities.

**B.    Defendants**

11.

Defendant NetEase, Inc. is a corporation organized and existing under the laws of the Cayman Islands with its principal place of business in the People's Republic of China. NetEase is publicly traded on the NASDAQ, and its business is a large multi-media company with numerous wholly owned and/or controlled subsidiaries, whose primary business includes online games, music streaming, online intelligent learning services and internet content services businesses. Though NetEase is publicly traded, a substantial portion of ownership in the company is still held by undisclosed private owners, which include, upon information and belief, members of the Chinese Communist Party.

12.

Defendant NetEase Interactive Entertainment Pte. Ltd. ("NetEase IE") is a Singapore private limited company with its principal place of business in China or Singapore. On information and belief, NetEase IE is a subsidiary of Defendant NetEase, Inc., through which NetEase conducts and manages various investments and operations in the United States.

13.

Defendant NetEase Information Technology Corporation ("NetEase IT") is a California corporation with its principal place of business in California. On information and belief, NetEase IT is a wholly owned subsidiary of Defendant NetEase, Inc., through which NetEase conducts and manages various investments and operations in the United States.

14.

NetEase, NetEase IE, and NetEase IT are collectively referred to herein as "NetEase and its Affiliates."

15.

Defendant Han Chenglin is a natural person of the full age of majority with residency in Malaysia. Mr. Han is a NetEase employee and also served on the Board of Directors of Crop Circle Games as NetEase IE's representative director.

16.

NetEase, NetEase IE, NetEase IT, and Han Chenglin are collectively referred to herein as "NetEase Defendants."

17.

Defendant Crop Circle Games is a Delaware Corporation with its principal place of business in Louisiana. Crop Circle Games is an independent video game development studio and a subsidiary of Prytania Media LLC.

18.

Depending on the vesting schedule for employee ownership units, Crop Circle Games is owned approximately 75% by Prytania Media LLC and 25% by NetEase and its Affiliates. Prytania Media LLC is 100% owned by Prytania Media Corp.

19.

On January 3, 2025, given the filing of this suit, Annie and Jeff Strain resigned their officer and management positions with Crop Circle Games. They also advised Crop Circle Games' remaining Board member, in writing, that they would abstain from any Board votes related to this matter.

20.

Following the Strains' letter to the Board, the remaining member of the Crop Circle Games Board of Directors with authority to act with respect to this matter is Han Chenglin. In that role, Mr. Han has the authority to hire a manager to engage counsel to represent Crop Circle Games in this matter, respond to any request for indemnity, and to pursue claims against NetEase. To Plaintiffs' knowledge, Mr. Han has declined to take any actions at all.

### C.  No Diversity of Citizenship

21.

Plaintiffs are citizens of Louisiana and Delaware.

22.

Defendants are citizens of Louisiana, Delaware, California, China, Malaysia, Singapore, and a British Overseas Territory.

23.

Therefore, there is no diversity of citizenship.

## II.  JURISDICTION AND VENUE

### A.  Jurisdiction

24.

This Court has personal jurisdiction over the Defendants pursuant to La. Code Civ. P. art. 6 and La. R.S. 13:3201.

25.

This lawsuit is brought by a corporation with its principal place of business located in Orleans Parish, along with the corporation's owners, CEO, and President of Studios, each of whom is a Louisiana resident domiciled in Orleans Parish Louisiana.

26.

Plaintiffs assert claims against Crop Circle Games, which has its principal place of business in Orleans Parish and is subject to general personal jurisdiction in the State of Louisiana.

27.

Plaintiffs assert claims against NetEase which directly and/or through its subsidiary/ries invested in Crop Circle Games, an Orleans Parish-based company, appointed a director and otherwise contributed to the Company's day-to-day operations. NetEase and its Affiliates were both directly involved and involved in the management of the Louisiana-based entity and the misconduct at issue through the actions of their servant and employee Mr. Han Chenglin and others.

28.

Plaintiffs also assert claims against Mr. Han Chenglin, NetEase and its Affiliates' representative member of the Board of Directors of Crop Circle Games. Mr. Han was directly involved in the management of the Louisiana-based company, as well as the actionable conduct that occurred within the State of Louisiana.

29.

Mr. Han and NetEase and its Affiliates were purposely interacting with the Louisiana market for their direct financial benefit, and, through their misconduct, caused substantial damage in the State of Louisiana.

30.

Mr. Han and NetEase and its Affiliates took actions that were intended to harm a Louisiana-based company, did harm a Louisiana-based company, and also caused substantial harm directly to Louisiana residents.

**B. Venue**

31.

Venue is proper in Orleans Parish because a Defendant in this action—Crop Circle Games—is a foreign corporation licensed to do business in this State with its principal place of business located in Orleans Parish, and Plaintiffs specifically allege that Defendants are joint and solidarily liable for the actions alleged herein. La. Code Civ. Pro. Art. 42(4).

32.

If venue is proper for one joint or solidary obligor under Article 42, it is proper to all others. La. Code Civ. Proc. art. 73(A).

33.

Additionally, Han Chenglin does not have an agent for process.

34.

Similarly, NetEase, NetEase IE, and NetEase IT are not properly registered to do business in Louisiana.

### 35.

The venue for claims against nonresident foreign corporations not licensed to do business in the State and a nonresident individual without an agent for service of process is the parish of the Plaintiffs' domicile. La. Code Civ. Pro. art. 42(5).

### 36.

Since Orleans Parish is the domicile of the Plaintiffs in this action, it is the appropriate venue.

### 37.

Orleans Parish is also where damages were sustained. La. Code Civ. Pro. art. 74.

**C.      Notice to the Attorney General for the State of Louisiana**

### 38.

On February 14, 2025, after the filing of the Original Petition, and in accordance with La. R.S. 51:1409(B), Plaintiffs provided Notice to the Louisiana Attorney General of the misconduct described in their Original Petition and this Amended, Restated, and Verified Petition for Damages and Injunctive Relief.

### 39.

Pursuant to La. R.S. 51:1409(A), following Notice by the Louisiana Attorney General, if the misconduct described in this Amended, Restated, and Verified Petition for Damages and Injunctive Relief does not abate, Plaintiffs are entitled an award of enhanced relief, including treble damages.

### 40.

On information and belief, NetEase has taken no steps to abate the misconduct that is causing harm to the Plaintiffs; therefore, they are entitled to enhanced relief as provided for by law.

## III. Background Facts – the Video Game Industry

### A. The Industry as a Whole

41.

Videogames are a massive industry. Industry reports valued its market size at 188 billion

dollars in 2021,[1] but more recent estimates place the value over $300 billion. Technological

developments have enabled gameplay on a range of devices—such as smartphones, personal

computers, and consoles—and users can play games from almost anywhere in the world due to

advancements in cloud-gaming and internet services.[2] These innovations have made videogames

the largest sector of the entertainment industry, far exceeding the film and music sectors.[3] In the

United States alone, more than 100,000 people were employed in the videogame industry in 2023.

42.

Videogame development commonly operates through contractual relationships between

developers and publishers. Videogame developers create a game by employing programmers to

write its code, artists and visual designers to create its graphical components, and writers to build

its story and narrative assets. Development studios vary in size, ranging from solo developers to

large-scale companies with billions of dollars in revenue.[4] Game development costs also vary,

ranging from just thousands of dollars for some "indie" games to hundreds of millions of dollars

for major titles.[5]

---

[1] *Video Games Market Size, Share & COVID 19 Impact Analysis, By Device (Smartphones, PC/Laptop, and Consoles), By Age Group (Generation X, Generation Y, and Generation Z), By Platform Type (Online and Offline), and Regional Forecast 2022-2029*, FORTUNE BUS. INSIGHTS (May 27, 2024), https://www.fortunebusinessinsights.com/video-game-market-102548 (last visited Feb. 14, 2025).

[2] Complaint ¶ 22, In the Matter of Microsoft Corp. and Activision Blizzard Inc., FTC Docket No. 9142, (Dec. 8, 2022).

[3] Clement, J., Count *of establishments and employment for the U.S. video game industry and its principal sectors in 2023*, STATISTA (Apr. 25, 2024), https://www.statista.com/statistics/1257699/us-video-game-industry-establishment-employment-numbers/ (last visited Feb. 14, 2025).

[4] Zegarra, Tomas, *Game Developers vs Game Publishers: What's the difference?*, HEWLETT PACKARD (July 19, 2020), https://www.hp.com/us-en/shop/tech-takes/game-developers-vs-game-publishers (last visited Feb. 14, 2025).

[5] Costs in Video Game Development – With Real Examples, GAMPROFS (Jan. 23, 2024), https://gameprofs.com/costs-in-video-game-development-with-real-examples (last visited Feb. 14, 2025).

Videogame developers commonly contract with videogame publishers, which are larger companies that provide financial backing for the development and marketing necessary to bring a game to market successfully.

44.

Relationships with videogame publishers and other investors are therefore critical to the success or failure of companies like Prytania Media.

## B. Prytania Media Studios

45.

Both Annie and Jeff Strain are veterans in the video game industry. They have an exceptional track record of effectively managing studios to launch commercially successful games. Part of this success includes Mr. Strain founding and launching two game franchises—*Guild Wars* and *State of Decay*—with each game in both franchises selling over a million copies individually and collectively generating billions of dollars since their release.[6]

46.

Leveraging their previous success in the video gaming industry, the Strains opened Plaintiff Prytania Media—an independent, privately held portfolio of game development studios focused on the creation of creative and innovative new games. The company helped create and manage the game development studios, and the studios' games were to be launched under Prytania Media's unique brand.

47.

Prytania Media was not only a Louisiana-based company. It was company that honored its Louisiana roots with a mission of bringing the gaming industry and its economic opportunity to the State. This is reflected in its name and local initiatives by the company—for example, its

---

[6] *Guild Wars Surpasses Six Million Units Sold*, IMAGINE GAMES NETWORK (Apr. 24, 2009), https://www.ign.com/articles/2009/04/24/guild-wars-surpasses-six-million-units-sold (last visited Feb. 14, 2025); Craft, Scott, *State Of Decay: Breakdown Gives You As Much Time As You Want To Dig Your Own Grave [REVIEW]*, PLAYER.ONE (Nov. 30, 2013), https://www.player.one/state-decay-breakdown-gives-you-much-time-you-want-dig-your-own-grave-review-366965 (last visited Feb. 14, 2025); Winslow, Jeremy, *State Of Decay 2: Homecoming DLC Remasters First Game's Map, Launches On September 1 For Free*, GAMESPOT (Aug. 25, 2021), https://www.gamespot.com/articles/state-of-decay-2-homecoming-dlc-remasters-first-games-map-launches-on-september-1-for-free/1100-6495517/ (last visited Feb. 14, 2025).

Mosaic Initiative and Prytania Media Scholars program, which provided scholarships and work experience in the industry to local students in the New Orleans community.

### C.    Crop Circle Games

48.

In late 2022, Mr. and Mrs. Strain opened the second independent game development studio under the Prytania Media umbrella—Crop Circle Games.

49.

Though Crop Circle Games was an independent studio, it carved out a place in the gaming industry through the reputation of Prytania Media and its founders Mr. and Mrs. Strain. From the beginning, it was able to recruit top talent.

50.

Prytania Media and the Strains were closely associated with each of Prytania Media's independent subsidiary studios. News reports would frequently refer to the studios as Prytania Media studios.[7] They would also frequently reference that the Strains founded these studios and detail their success in the gaming industry.[8]

### D.    NetEase

51.

NetEase, Inc. is a large Chinese-based company whose primary business includes online games, music streaming, online intelligent learning services and internet content services businesses.

---

[7] McEvoy, Sophie, *Prytania Media opens two new AAA studios*, GAMES INDUSTRY (Aug. 17, 2023), https://www.gamesindustry.biz/jeff-strain-launches-crop-circle-games (last visited Feb. 14, 2025).

[8] Rousseau, Jeff, *Jeff Strain launches Crop Circle Games*, GAMES INDUSTRY (Oct. 25, 2022), https://www.gamesindustry.biz/jeff-strain-launches-crop-circle-games (last visited Feb. 14, 2025)("ArenaNet co-founder and Prytania Media founder Jeff Strain has announced the opening of game development studio Crop Circle Games.; "Established in 2021 by Jeff and Annie Strain, Prytania is a game development firm with a focus on new IPs."); Cook, Adam, *Former ArenaNet and Undead Labs founder secures $25M investment for new studio*, GAME WATCHER (Oct. 25, 2022), https://www.gamewatcher.com/news/jeff-strain-arenanet-undead-labs-crop-cirlce-games, (last visited Feb. 14, 2025); *Prytania Media Founders Reveal Two Additional AAA Studios*, TERMINALS.IO (Aug. 16, 2023), https://www.terminals.io/news/4161, (last visited Feb. 14, 2025).

52.

Gaming is a significant aspect of NetEase's business. A section of the company operates globally under the name "NetEase Games." NetEase Games has operations in the United States, including an office in California.

53.

While this litigation involves NetEase investing in Crop Circle Games, as described above, NetEase is game developer in its own right, making it a competitor to Prytania Media and the Strains. NetEase has also expanded its game development operations into the United States. Indeed, in May 2022, NetEase launched its first game studio, called "Jackalyptic Games," in the United States in Austin, Texas.[9] NetEase has since opened additional game studios in Texas and Delaware, among others.[10]

54.

NetEase's empire is vast, with over $15,000,000,000 in reported annual revenue and an estimated net worth of over $55,000,000,000. For comparison, its reported net worth is higher than the Gross Domestic Product of 91 countries around the world.

55.

According to NetEase's own documents, due to legal restrictions on foreign investments NetEase does not engage in its primary business in the United States directly. Instead, it attempts to operate its business globally from China, using subsidiaries, contractual agreements with non-majority owned companies it controls known as "variable interest entities" ("VIE"), and "nominee shareholders." These contractual agreements give NetEase "the power to direct the activities that most significantly impact the economic performance of the VIEs and their subsidiaries."[11] On

---

[9] *NetEase Games Launches First Studio in the U.S.*, NETEASE GAMES (May 5, 2022), https://www.neteasegames.com/news/game/20220505/30576_1016017.html, (last visited Feb. 14, 2025); Rousseau, Jeff, *Jackalope Games is now Jackalyptic Games*, GAMES INDUSTRY (May 18, 2023), https://www.gamesindustry.biz/jackalope-games-is-now-jackalyptic-games, (last visited Feb. 14, 2025).

[10] *NetEase Games Announces Jar of Sparks —— A New U.S. Studio Fronted by Industry Veterans* NETEASE GAMES (Jul. 15, 2022), https://www.neteasegames.com/news/game/20220715/30576_1031051.html, (last visited Feb. 14, 2025); *NetEase Games Introduces T-Minus Zero Entertainment, a New Global Studio Led By Award-Winning Industry Veteran Rich Vogel*, NETEASE GAMES (Aug. 17, 2023), https://www.neteasegames.com/news/Corporate/20230817/37075_1105093.html, (last visited Feb. 14, 2025).

[11] NetEase Inc., Annual Report (Form 10-K) (April 25, 2024), p. 43.

information and belief, NetEase IT and NetEase IE are subsidiaries of NetEase that the company was and is using to do business in the United States, and elsewhere.

56.

Based on the above information, and the course and conduct of the NetEase Defendants, they act as an alter ego of NetEase, Inc.

## IV.    NetEase's Wrongdoing

### A.    NetEase Invests in Crop Circle and Gains Some Control and Access

57.

NetEase (through NetEase IE) was an early investor into Crop Circle Games and purchased roughly 20 percent of the shares of the studio.

58.

As an initial investor with a large share of ownership in the company, Crop Circle Games granted NetEase IE significant investment rights.

59.

NetEase IE is the sole holder of Crop Circle Games' Class A shares. Holders of Crop Circle Games' Class A shares are entitled to elect one director onto the Board of Directors of the company. NetEase selected Mr. Han Chenglin as its Board Member.

60.

NetEase's influence in Crop Circle Games went beyond the selection of a Board Member. Pursuant to its investment rights, agents, servants, or employees of NetEase have been present at Board meetings to speak on behalf of NetEase and manage its investment. In addition, at least one other employee of NetEase was hired to help manage the business at Crop Circle Games.

61.

Crop Circle Games hired NetEase employee Jeffery Chen as Vice President of Corporate Development. On information and belief, he had frequent conversations with NetEase informing it of Crop Circle Games' internal affairs.

62.

At all relevant times, agreements between NetEase and Crop Circle Games gave NetEase significant access to Crop Circle Games' financial information—including, but not limited to,

delivery of financial statements such as unaudited statements of income and cash flows for each fiscal quarter within 30 days of the end of that quarter and any material information relating to the financial condition, business, prospects, or corporate affairs of the Company.

### B.    Questions Arise Regarding NetEase's Compliance with the Law

#### 63.

Mr. and Mrs. Strain were enthusiastic about their investment relationship with NetEase and about the game Crop Circle Games was developing. However, this enthusiasm began to be overshadowed by worries of NetEase's compliance with United States law, including United States law concerning the investment of foreign entities in the United States.

#### 64.

Mrs. Strain repeatedly offered NetEase information concerning knowledgeable individuals and companies who could assist NetEase in ensuring that it was and at all times remained in full compliance with United States foreign investment law, all with a desire to continue to the investment relationship. NetEase rejected each offer for assistance.

### 1.    Committee on Foreign Investment in the United States (CFIUS) Disclosures

#### 65.

The Committee on Foreign Investments (CFIUS) has the authority to review transactions involving foreign investment in the United States to determine whether any national security risk exists.

#### 66.

NetEase is a foreign entity invested in Crop Circle Games. Pursuant to that investment, NetEase received preferred stock with unique rights to block certain actions and exhibited control through those preferential rights. Due to the foreign investment and control rights, NetEase's investment was a covered control transaction under CFIUS rules and within CFIUS's authority for review. 31 CFR § 800.210.

#### 67.

NetEase was aware that CFIUS had the authority to review this transaction. On May 6, 2022, prior to NetEase's official investment in Crop Circle Games, Han Chenglin emailed some

of the Plaintiffs about keeping NetEase's investment in the company low profile to "keep away from the radar of CFIUS."

68.

NetEase was likely also aware that CFIUS has the authority to review any and all past transactions and investments it has made in the United States.

69.

A CFIUS declaration is mandatory when the foreign party to the transaction with a TID United States business has substantial government ownership. 31 CFR § 800.401.

70.

CFIUS likely would consider Crop Circle Games as a TID business. 31 CFR 800.248 - TID U.S. business. Prytania Media makes electronic games with a primary business objective of serving millions of customers. Crop Circle Games collects "identifiable data" from its customers when they download the game and create a profile. Customers' online profile includes identifiable data such as the customers' names, contact information, and financial information for in-game purchases. 31 CFR 800.226. The functionality of the game suggests that these data are sensitive personal data due to the non-public electronic communication therein as well as geolocation data. 31 CFR § 800.241(a)(ii)(E) and (F).

71.

Crop Circle Games maintains or collects sensitive personal data of U.S. citizens or had a demonstrated business objective to collect such data in the future through users' online profiles. NetEase, as one of the largest gaming companies in the world, knew or should have known that sensitive personal data were involved in this transaction.

72.

NetEase is supported by the Government of China and, as a result, likely has further Chinese Communist Party and state-ownership that it seeks to keep confidential.

73.

Although some of its stocks are publicly traded, NetEase is a substantially privately owned company. It is reported that individuals own the lion's share in the company with 45%

14

ownership.[12] The information on individual owners is not publicly available. It does appear, however, that Ding Lei owns a significant portion of NetEase.

74.

Ding Lei is the Chief Executive Officer and founder of NetEase. Mr. Ding also appears to be member of the Chinese Communist Party (CCP), China's ruling party. Mr. Ding was a delegate to the Chinese People's Political Consultative Conference (CPPCC).[13]

75.

The CPPCC is the highest-ranking body in the united front system.[14] The "united front" is a political strategy of the CCP involving networks of groups and key individuals that are influenced or controlled by the CCP and used to advance its interests.[15]

76.

The Government of China also has increased its oversight of technology companies such as NetEase through "golden shares."[16] These "golden shares" usually involve a one percent share in the company and allow the Government of China's Cyberspace Administration of China (CAC) —the country's central internet censorship, oversight, and control agency—to have a hand in the businesses by demanding a board seat and the right to moderate content.[17] Shortly after the Government of China's "golden shares" of large technology groups was announced, Chinese Government Authorities resumed approvals for sales of new video games for politically compliant

---

[12] *With 45% ownership, NetEase, Inc. (NASDAQ:NTES) insiders have a lot at stake*, SIMPLY WALL ST (Aug. 20, 2024), https://finance.yahoo.com/news/45-ownership-netease-inc-nasdaq-120034930.html?guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAEV_f35fP6Dysa6sgWS1McjHwEnSX6u9zuUr9CDPaQ2JzExGnsJXGBZ7FO59KCl3eMzJd2ZZiiMjHPBBwVS_VvMMlzubuAzFnI86D6dO8u88UsF3Sbyv86kLEH_jh9VWhzHEn_gebVs48hLyeY8iCFqfhOuoMWmDbqFGYVlVLNkm&guccounter=2, (last visited Feb. 14, 2025).

[13] Chen, Laurie, *At China political meeting, internet bosses are out, chip execs are in*, REUTERS (Mar. 3, 2023), https://www.reuters.com/technology/china-political-meeting-internet-bosses-are-out-chip-execs-are-2023-03-03/, (last visited Feb. 14, 2025).

[14] *Bowe, Alexander, China's Overseas United Front Work: Background and Implications for the United States*, U.S.-CHINA ECONOMIC AND SECURITY REVIEW COMMISSION (Aug. 24, 2018).

[15] *Id.*

[16] McMorrow, Ryan, *China moves to take 'golden shares' in Alibaba and Tencent units*, FINANCIAL TIMES (Jan. 12, 2023), https://www.ft.com/content/65e60815-c5a0-4c4a-bcec-4af0f76462de, (last visited Feb. 14, 2025).

[17] Rees, Lewis, *China takes steps to tighten grip on tech by acquiring 'golden shares' in Tencent and Alibaba*, POCKET GAMER (Jan. 13, 2023), https://www.pocketgamer.biz/china-takes-steps-to-tighten-grip-on-tech-by-acquiring-golden-shares-in-tencent-and-alibaba/, (last visited Feb. 14, 2025).

companies such as Tencent Holdings and NetEase, because the Cyberspace Administration of China retained oversight through "golden shares."[18]

77.

Tencent Holdings—this similarly politically compliant gaming and multimedia company—has already been subject to additional CFIUS scrutiny by the United States Department of Treasury, largely triggered by an investments into United States gaming companies just as NetEase did in this case.[19] The United States Department of Defense also recently designated Tencent Holdings as a company that works with the Chinese military, evidencing that NetEase's compliance with the CCP could be indicative larger involvement with the Chinese government and its security risks.[20]

78.

NetEase investments demonstrate it is supported by the CCP. NetEase entered into a joint venture with China Telecom Corporation Limited to launch "YiChat", a mobile Internet multimedia instant messaging application for smartphones.[21] China Telecom Corporation Limited (China Telecom) is a majority state-owned telecommunications company based in China. China Telecom board chair Wang Xiaochu and NetEase CEO Ding Lei conducted secret meetings to establish this partnership.[22] Such an important partnership would require blessing and approval by CCP leadership.

---

[18] Leng, Cheng and Lockett, Hudson, *China tech stocks stage $700bn recovery rally*, FINANCIAL TIMES (Jan 18, 2023), https://www.ft.com/content/b7fe7b64-a6ab-4f49-b9a8-a6709cac7c36, (last visited Feb. 14, 2025).

[19] Roumeliotis, Greg and Wang, Echo, *EXCLUSIVE China's Tencent in talks with U.S. to keep gaming investments -sources*, REUTERS (May 5, 2023), HTTPS://WWW.REUTERS.COM/TECHNOLOGY/EXCLUSIVE-CHINAS-TENCENT-TALKS-WITH-US-KEEP-GAMING-INVESTMENTS-SOURCES-2021-05-05/, (last visited Feb. 14, 2025).

[20] Hoskins, Peter, *US designates Tencent a Chinese military company*, BBC (Jan 7, 2025), https://www.bbc.com/news/articles/c9q78wn9g8zo, (last visited Feb. 14, 2025); Martina, Micheal, Shepardson, Davis, and Freifeld, Karen, *US adds Tencent, CATL to list of Chinese firms allegedly aiding Beijing's military*, REUTERS (Jan 9, 2025), https://www.reuters.com/world/us-adds-tencent-catl-list-chinese-firms-allegedly-aiding-beijings-military-2025-01-06/, (last visited Feb. 14, 2025).

[21] China Telecom Corporation Limited, Annual Report (Form 20-F) (Dec. 31, 2018).

[22] *Are China Telecom and NetEase Taking on WeChat with a New Mobile Chat App?*, TECH IN ASIA (April 3, 2013), https://sg.finance.yahoo.com/news/china-telecom-netease-taking-wechat-011118266.html, (last visited Feb. 14, 2025).

## 79.

China Telecom is a known bad actor and national security risk. China Telcom was ordered to stop operating in the United States due to national security concerns.[23] The United States determined China Telecom's American subsidiary was subject to Chinese government control and influence. Given NetEase's partnership with China Telcom and, on information and belief, the Government of China's likely "golden share" ownership, NetEase is subject to Chinese government control and influence.

## 80.

In addition to state-ownership, the CCP requires the establishment of Communist Party Organizations in both state and private Chinese companies. China's Company Law states that companies shall permit party organizations to be established and provided the necessary conditions to operate.[24] In fact, the CCP Constitution provides for specific powers for party organizations within companies and calls for party organizations to be formed in any company that has three or more party members.[25]

## 81.

Pursuant to the CCP Constitution, the Communist Party Organization should "guide and oversee their enterprises' observance of state laws and regulation."[26] Keeping with Mao Zedong's mantra that "east, west, south, and north, the party leads everything," China's President Xi Jinping has become increasingly strident that the CCP should play the leading role in guiding China's economy, implemented in part through CCP party organizations within private companies.[27]

---

[23] Disis, Jill, *US government bans China Telecom from operating in the country*, CNN BUSINESS (Oct. 27, 2021), https://www.cnn.com/2021/10/27/business/china-telecom-fcc-license-intl-hnk/index.html, (last visited Feb. 14, 2025).

[24] Company Law of the People's Republic of China (2018 Amendment), CHINA LAW INFO, (Oct. 26, 2018).

[25] CONSTITUTION OF THE COMMUNIST PARTY OF CHINA, Oct. 24. 2017.

[26] *Id.*

[27]Borst, Nicholas, *Party Committees in Chinese Companies*, SEAFARER (June 2021), https://www.seafarerfunds.com/prevailing-winds/party-committees-in-chinese-companies/, (last visited Feb. 14, 2025).

82.

There is also evidence that NetEase has used the threat of the CCP against an American gaming company in business dealings. In 2023, Activision Blizzard Inc. ("Activision") was in tense negotiations with NetEase in a licensing deal.[28] NetEase sought more rights because of Chinese antitrust regulations widening the CCP's authority over technology companies in China.[29] At this time, Activision was also in the process of being acquired by Microsoft for a historic $75.4 billion in cash. According to Activision executives, NetEase's CEO Ding Lei implied he could sway the CCP to either block or support the deal depending on the outcome of their discussions.[30] In fact, Activision executives reported they felt threatened after the meeting.[31]

83.

On information and belief, NetEase is a substantial foreign owned business that engaged in a covered transaction with a TID United States business to be subject to mandatory reporting requirements.

84.

CFIUS Declarations must include complete organizational charts, both pre- and post-transaction, that identifies the immediate parent, the ultimate parent, and each intermediate parent of each foreign person that is a party to the transaction. 31 CFR § 800.404. The declaration also requires a "statement as to whether any party to the transaction has been party to another transaction previously notified or submitted to the Committee." *Id.* If it complied with its reporting requirements, NetEase would be required to identify its government ownership and any "golden shares" in a mandatory CFIUS declaration. Moreover, it would be required to identify owners and board members that are Members of the CCP and their position within the CCP, as well as the existence of its CCP party organization, it members, and the control it exerts over NetEase.

---

[28] Browning, Kellen and Che, Chang, *Rift Between Gaming Giants Shows Toll of China's Economic Crackdown*, NEW YORK TIMES (Mar. 29, 2023), https://www.nytimes.com/2023/03/29/technology/activision-netease-china-breakup.html, (last visited Feb. 14, 2025).

[29] *Id.*

[30] *Id.*

[31] *Id.*

85.

Even if CFIUS reporting is not always mandatory, it is highly encouraged because the Committee can unwind a transaction at any time if it is concerned there is a significant national security risk.

**2.     Prytania Media's Questions Regarding NetEase's Compliance**

86.

As mentioned, on May 6, 2022, prior to NetEase's official investment in Crop Circle Games, Han Chenglin emailed some Plaintiffs on keeping NetEase's investment in the company low profile to "keep away from the radar of CFIUS."

87.

Shortly after, on May 15, 2022, NetEase's counsel in the transaction represented they did not currently believe there was a need for a CFIUS filing because Crop Circle Games' product was still in development and approximately two years out. Instead, they offered that the issue would be revisited as needed and potentially upon further diligence information.

88.

Relying on these representations, Mr. and Mrs. Strain followed through on the investment.

89.

Based on the size and scope of NetEase investment in American game companies, as well as the representations of NetEase's counsel that compliance would be revisited, Jeff and Annie Strain reasonably assumed that there was a significant legal framework to ensure legal compliance with United States law, specifically CFIUS.

90.

However, once the investment was fully executed, Jeff and Annie discovered there was no adequate structure to ensure NetEase was compliant with United States law.

91.

In fact, NetEase pushed Prytania Media to take action to aid its avoidance of United States regulations. NetEase frequently pitched that Prytania Media should open a Canadian or Irish division to make it easier for NetEase to invest.

92.

On October 18, 2022, shortly after NetEase's investment in the company, Jeff and Annie had dinner with NetEase partners, including members of their legal team and Simon Zhu, General Manager of NetEase's Global Games Investments. Mrs. Strain directly asked Mr. Zhu whether NetEase was compliant with CFIUS. During this conversation, she offered to go to Washington, D.C. with him and make introductions with lobbyists and lawyers who could assist NetEase with its compliance. Mr. Zhu immediately panicked and denied foreign ownership or connections with the Chinese Communist Party. Mrs. Strain attempted to emphasize her concern over CFIUS requirements, but Mr. Zhu quickly cut off the conversation and told her that he did not want to talk about it.

93.

Though NetEase's legal representative and Manager of Global Games Investments were present, no one at any point offered any substantive information about NetEase's compliance with CFIUS.

94.

On or about March 23, 2023, Jeff and Annie Strain met with NetEase representative during the Game Developers Conference in San Fransico, California at of one of NetEase's United States-based law firms' offices. Mrs. Strain again directly offered Mr. Zhu assistance with ensuring all of NetEase's Western investments were compliant with CFIUS. She emphasized that it was essential that Prytania Media be completely in compliance with United States law. Like before, Mr. Zhu appeared panicked and refused to engage on the subject.

95.

Mr. Zhu also appeared to become increasingly hostile and aggressive. During the conversation, Mr. Zhu explained that NetEase cannot draw any attention to its Western investments because its Chief Executive Officer, Ding Lei, was in the process of emigrating to the United States, and it could threaten his physical safety. Mr. Zhu then left the room, abruptly ending the conversation.

96.

Lastly, in November 2023, Mrs. Strain again offered her assistance to NetEase to help it report its United States investments. NetEase again rejected this assistance. At this point, the working relationship with Prytania Media and Crop Circle Games had significantly deteriorated.

97.

Even as NetEase claimed to be in compliance, it offered no legal basis, report, or any actual assurance it was in compliance.

### 3. On Information and Belief, NetEase's Intention for Deployment of Funds throughout the United States.

98.

NetEase has been attempting to diversify its investments outside of China and into the West.

99.

NetEase Games opened a United States office in California in 2015.[32]

100.

In the past few years, NetEase has been rapidly expanding in the United States—both opening its own studios and investing in United States-based game development companies like Crop Circle Games.[33]

101.

Currently, the United States is NetEase's largest secondary market.[34]

---

[32] *NetEase Expands Global Presence with First Headquarters in the West*, BUSINESSWIRE (Feb. 24, 2015), https://www.businesswire.com/news/home/20150224005365/en/NetEase-Expands-Global-Presence-with-First-Headquarters-in-the-West, (last visited Feb. 14, 2025).

[33] *NetEase Games Launches First Studio in the U.S.*, NETEASE GAMES (May 5, 2022), https://www.neteasegames.com/news/game/20220505/30576_1016017.html, (last visited Feb. 14, 2025); Rousseau, Jeff, *Jackalope Games is now Jackalyptic Games*, GAMES INDUSTRY (May 18, 2023), https://www.gamesindustry.biz/jackalope-games-is-now-jackalyptic-games, (last visited Feb. 14, 2025); *NetEase Games Announces Jar of Sparks —— A New U.S. Studio Fronted by Industry Veterans*, NETEASE GAMES (Jul. 15, 2022), https://www.neteasegames.com/news/game/20220715/30576_1031051.html, (last visited Feb. 14, 2025); *NetEase Games Introduces T-Minus Zero Entertainment, a New Global Studio Led By Award-Winning Industry Veteran Rich Vogel*, NETEASE GAMES (Aug. 17, 2023), https://www.neteasegames.com/news/Corporate/20230817/37075_1105093.html, (last visited Feb. 14, 2025).

[34] Taylor, Carrison, *NetEase's Shifting Global Strategy*, NAAVIK (Nov. 7, 2023), https://naavik.co/digest/netease-global-strategy/, (last visited Feb. 14, 2025).

102.

Upon information and belief, NetEase has never reported an investment to CFIUS and attempting to ensure its compliance now would open it to liability and threaten its expansion.

**4.      On Information and Belief,
The Plan for NetEase's Executives
to Emigrate to the United States.**

103.

Part of NetEase's rapid Western expansion includes the emigration of its Chief Executive Officer Ding Lei to the United States—a fact that was admitted to by NetEase's General Manager of Global Games Investments Mr. Zhu.

104.

In 2020, Ding Lei purchased a $29 million dollar Bel-Air mansion in Los Angles, California from billionaire Elon Musk.[35]

105.

Similarly, on or around November 2022, Simon Zhu admitted that he and other NetEase employees were actively attempting to emigrate from China. He told Mr. and Mrs. Strain that he had purchased a large amount of property in Idaho and referred to it as his new "home base."

106.

Upon information and belief, part of the reason NetEase dodged confirming its compliance with United States regulations was to assist with the emigration process for executives and managers.

**C.      NetEase's Response**

107.

After Mrs. Strain's repeated inquiries, Prytania Media's relationship with NetEase shifted and became tense.

---

[35] Yi, Ding, *Chinese Gaming Billionaire Buys Elon Musk's LA Mansion for $29 Million*, CX TECH (Jun. 22, 2020), https://www.caixinglobal.com/2020-06-22/chinese-gaming-billionaire-buys-elon-musks-la-mansion-for-29-million-101570723.html, (last visited Feb. 14, 2025).

Prior to Mrs. Strain's inquires, on November 11, 2022, NetEase representatives Han Chenglin and Jeffery Chen indicated that NetEase had a strong interest in making a large investment into Prytania Media itself and furthering their partnership.

109.

Shortly after Mrs. Strain's second inquiry, on or about March 23, 2023, Mr. Han informed Prytania Media that the "environment is not right" for NetEase to invest. NetEase has since rejected any offers about additional investment, including on November 7, 2023.

110.

Crucially, after this breakdown in the relationship, the Strains more recently learned that NetEase acted to silence Prytania Media's concerns by spreading false and defamatory rumors about the company.

**D.     Corroboration from Third Parties**

111.

Prytania Media has an investment relationship with a venture firm in the game development industry named Transcend Fund. ("Transcend"). The firm had invested in the company itself and in another of Prytania Media's subsidiary studios—Fang & Claw Corp.

112.

On February 22, 2024, Mr. Strain received a text from Andrew Sheppard, the managing director of Transcend, who informed him that allegations of fraud and misuse of funds were being leveled against Crop Circle Games. This allegation was memorialized in an email on February 23, 2024.

113.

This text message from Mr. Sheppard is the first time Plaintiffs learned that there were rumors accusing them of being involved in fraudulent conduct and misuse of funds.

114.

On information and belief, one of Transcend's limited partners told the firm that it had received reports of financial wrongdoing from a "close-connection" that had invested in "another

Prytania Media company"— Crop Circle Games. Transcend stated that this limited partner was a publicly traded gaming company headquartered in Asia.

115.

Mr. Sheppard later confirmed that NetEase was the company invested in Crop Circle Games that had given this incorrect and defamatory information to Transcend's limited partner in the gaming industry.

116.

Upon information and belief, NetEase told this gaming company that Crop Circle Games "was investigating fraudulent activities" on several bases. First, it was stated, incorrectly, that "[f]unds had been moved from Crop Circle Games to other subsidiaries without prior consent of relevant stakeholders." Second, "quarterly financials [were] potentially materially inaccurate." Lastly, NetEase asserted that "many key appointments [had] been let go" since "the potential leak" of the foregoing inaccurate information.

117.

All of the statements and implications were false and defamatory. A review of Crop Circle Game's financial statements, *which were at all relevant times held by and available to NetEase pursuant to contract,* proved conclusively that these statements were untrue.

118.

Further, any investor involved in the operations of Crop Circle Games with knowledge of the changing conditions in the gaming industry and Crop Circle Games' financial condition would have understood that any key employees of the studio were not let go because of any supposed leak of what was materially inaccurate information, but because of the financial state of the company.

**E.      Admissions by NetEase's Representative on the Crop Circle Board**

119.

In addition to Transcend's limited partner confirming that these allegations came from NetEase, at a meeting of Crop Circle Games' Board of Directors on March 7, 2024, Mr. Han admitted he and NetEase were the source of the baseless rumors.

24

### 120.

When the Strains confronted Mr. Han about the report from Transcend, Mr. Han admitted

that he had told his co-workers at NetEase that he was surprised Crop Circle Games had run out

of operating funds and that this was "likely" where the rumors came from.[36] In that meeting, he

admitted that he should have been more careful and that his internal communications had "leaked

to the public market."[37]

### 121.

Another representative of NetEase present at the meeting, Keemin Ngiam, added that there

had "[c]learly there ha[d] been some loose lips" and this was a matter they would address

internally.[38]

### 122.

Mr. Ngiam continued that NetEase "had internal discussions that were leaked and twisted"

in the public market.[39]

### 123.

Mr. Han also admitted that, at the time of the above alleged dissemination of inaccurate

and prejudicial information, he had not reviewed available and timely financial information *in the

possession of both he and NetEase*, and instead wrongly assumed such updated financial

information did not exist.

### 124.

Mr. Han admitted his comments to his coworkers about Crop Circle Games' financials

were based on "napkin math" and assumptions from the previous quarter of the fiscal year's

financial information.[40]

---

[36] Minutes of the Board of Directors of Crop Circle Games (March 7, 2024), p. 8-9 ("So I told my coworkers I'm really surprised that the company is running out of runway so quickly. I am sorry that this leaked to the public market. . . that's likely where the second rumor came from.").

[37] Minutes of the Board of Directors of Crop Circle Games (March 7, 2024), p. 13.

[38] Minutes of the Board of Directors of Crop Circle Games (March 7, 2024), p. 10.

[39] Minutes of the Board of Directors of Crop Circle Games (March 7, 2024), p. 12.

[40] Minutes of the Board of Directors of Crop Circle Games (March 7, 2024), p. 8-9 ("I did not get the Q3 financials. So, I was basing my assumptions on Q2 financials from June 2023"); Minutes of the Board of Directors

125.

This board meeting was the first time Plaintiffs had knowledge that the Defendants and others working in concert with the Defendants, including NetEase employees, were actually responsible for the defamatory rumors accusing them of being involved in fraudulent conduct and misusing funds.

**F.      The Market for Funding Dries Up; Plaintiffs Suffer the Harm.**

126.

These rumors concerning the Company's financial situation seriously prejudiced Crop Circle Games. The rumors also directly implicated Prytania Media and Jeff and Annie Strain, who were closely associated with the management of Crop Circle Games, in the supposedly "fraudulent activities" occurring at the studio, especially the allegation that funds were being moved to different subsidiaries—all to the direct and serious prejudice of Prytania Media as well as to the Strains individually.

127.

As a result of the allegations against Crop Circle Games, and as further evidence that NetEase's misconduct directly impacted Prytania Media, Transcend requested full access to all financial and audit information on all *Prytania Media* entities and associates, authorization to engage an independent financial auditor to look at *Prytania Media's* financial books at its expense, and execution of agreements granting Transcend more rights to information about Prytania Media and its studio Fang & Claw Corp.

128.

A large investor with experience working with Prytania Media demanding more rights over its investment demonstrates that these rumors had an immediate and tangible effect on investors' trust in Prytania Media's ability to manage its business.

---

of Crop Circle Games (March 7, 2024), p. 10 ("I did my napkin math, but I did not share the numbers with any of the team. I just shared the result of my math").

### 129.

The gaming community is a tight-knit community, and the above described inaccurate and widely prejudicial information quickly spread throughout the entire investment community.

### 130.

Shortly after NetEase spread the above referenced rumors, all of the potential investors into Crop Circle Games pulled out of then ongoing discussions regarding possibly investing in the Company.

### 131.

Also, shortly after NetEase spread these rumors, another Prytania Media studio, Fang & Claw Corp, was specifically denied an investment opportunity, with the would-be investor citing the rumor as a reason it would not proceed with the investment.

### 132.

Because of these rumors, Prytania Media and Crop Circle Games could not find an additional investor or a partner to publish Crop Circle Games' flagship game during a critical time. By March 2024, Crop Circle Games was worth nothing.

### 133.

A few weeks later, Prytania Media's first studio—Possibility Space Corp—was also worth nothing.

### 134.

One by one, each of Prytania Media's studios had to be closed. Ultimately, Prytania Media itself had to be shut down.

### 135.

As a direct result of the foregoing, Prytania Media and its subsidiaries, once an international venture worth hundreds of millions of dollars, are now worth nothing.

### 136.

Much of Mr. Han's actions occurred during the course and scope of his position as a Member of Crop Circle Games' Board of Directors, and thus a delegate of Crop Circle Games. His actions, and those of his NetEase team, received credibility based on the fact that he was a member of the Board of Directors of Crop Circle at all times, had unique and unfettered access to

Crop Circle Games and, for all purposes relevant to this matter, spoke as its delegate to the market and other third parties about its internal dealings.

137.

In addition, members of Mr. Han's team at NetEase then leaked the false and defamatory statements to "the public market," causing harm to the Plaintiffs.

138.

Similarly, much of Mr. Han's actions helped spread misinformation within NetEase and then out to third parties, other investors, and the market allowed NetEase and Mr. Han to destroy the reputations of Prytania Media and both Mr. and Mrs. Strain.

139.

Finally, the actions of other, unnamed NetEase and Crop Circle employees and representatives were undertaken during the course and scope of their positions and affiliations with both entities, lending credibility and a gravitas to baseless and unsupported rumors that would ultimately have the intended effect of running Prytania Media out of business entirely.

## V.      Damages

### A.      Damage to Prytania Media

#### 1.      Pre-Dispute Valuations

140.

Prior to the misconduct of the NetEase Defendants, Prytania Media was independently valued in three different ways by three different methods.

141.

First, in November of 2023, it was valued by two third parties providing discounted cash flow valuations of the enterprise. The details of those valuations are confidential, and will be produced in discovery or submitted under seal, as appropriate. However, the information that can be disclosed publicly is provided in this Amended Petition.

142.

The first valuation using the discounted cash flow methodology valued Prytania Media's investment in Crop Circle Games worth $66,500,000. The same valuation using the discounted cash flow methodology valued Prytania Media's investment in Possibility Space Corp worth

28

$175,000,000. The combined value of Prytania Media, even without ascribing any value to other studios, was $241,500,000.

143.

This first valuation was audited by an independent third party auditor and found to be supportable, without exception, based on the operating business at that time.

144.

Second, in the Fall of 2022, a valuation of Prytania Media was performed in connection with potential third party investment into the entity. The details of the valuation, including its purpose, are confidential, and will be produced in discovery or submitted under seal, as appropriate. However, the information that can be disclosed publicly is provided in this Amended Petition.

145.

This second valuation was used for a third party to obtain a non-equity position in Prytania Media at the time. In that valuation, the value of Prytania Media was projected between $316,000,000 as a "Base Case" and $344,000,000 as a "High Case," both prior to investment by a third party.

146.

The third party, after reviewing that valuation, in an arms' length transaction, closed a transaction with Prytania Media based on that valuation.

147.

Therefore, prior to NetEase's misconduct, Prytania Media's value was approximately $344,000,000.

## 2.     Today's Value

148.

NetEase's misconduct destroyed Prytania Media and the studios that it owned.

149.

Today, Prytania Media does not operate as a going concern. It has no value, and it has no ongoing operations.

150.

Today, as a direct consequence of the Defendants' actions, Prytania Media has no ability to raise capital from investors for ongoing or future development of any kind.

151.

Today, Prytania Media has no revenue stream, no ability to raise capital, and no value, regardless of the manner in which a third party were to value it.

### 3. Future Value

152.

The video game industry is expanding, and it is more popular than even the film industry.

153.

Prytania Media was poised to capitalize on that growth and had the potential to bring to market many successful games in the future, each of which would have been even more lucrative than the documented value of its company at $344,000,000.

154.

As a consequence of the Defendants' actions, that value will not be realized, and Plaintiffs are entitled to the lost profits and other damages associated with that lost opportunity.

### B. Damage to Annie and Jeff Strain

155.

Defendants' misconduct damaged Mr. and Mrs. Strain in many ways, including ruining their careers, inhibiting their ability to raise capital, preventing them from starting or continuing in a business in their chosen-industry, or to otherwise engage in their businesses in any respects.

156.

The Strains do not seek the recovery of damages for emotional distress caused by the Defendants.

### C. Trebling of Damages

157.

Under La. R.S. 51:1409, if a Defendant continues to engage in actions prohibited by the Louisiana Unfair Trade Practices Act following notice from the Attorney General of the State of Louisiana, that Defendant is subject to having an award of damages trebled.

158.

On January 24, 2025, Plaintiff provided the Louisiana Attorney General with notice of the claims at issue in this case.

159.

Defendants have taken no steps to abate or otherwise terminate the misconduct providing the basis of the suit in this matter.

160.

Therefore, Plaintiffs are entitled to all enhanced relief provided for by statute, including treble damages, interest, attorneys fees, and costs.

## VI.   Counts Alleged

## COUNT I – DEFAMATION

161.

Plaintiffs re-allege and incorporate all allegations set forth in the preceding paragraphs, as if fully set forth herein.

162.

To the extent the allegations in this Count are inconsistent with the allegations contained in any other Count, such allegations are pled in the alternative.

163.

Defendants made and published false statements about those who manage Crop Circle Games to non-privileged third parties.

164.

Defendants made and published to third parties these false statements without privilege or authorization.

165.

Defendants had no basis to believe the statements were true and instead had actual and constructive knowledge of the statements' falsity.

## 166.

The statements were made negligently and/or with malice for the purpose of damaging the Plaintiffs reputations.

## 167.

Defendants have admitted to making the false and defamatory statements at issue in this case.

## 168.

Defendants' statements described above wrongfully accuse Crop Circle Games, the Strains and Prytania Media, as well as its managers and employees of fraudulent conduct, mismanagement of a business, and dishonesty. Because of Plaintiffs' close association with the studio, these statements harmed the reputation of Prytania Media and Annie and Jeff Strain in their community, deterred others from working with them, and exposed them to contempt and ridicule.

## 169.

These statements also implicitly accuse Plaintiffs of criminal conduct and by their nature tend to injure Plaintiffs' personal and professional reputation, and these statements are therefore defamatory *per se.*

## 170.

In addition, under principles of *respondeat superior* Crop Circle Games and NetEase and its affiliates are liable in *solido* for the actions of their director on the Board of Directors of Crop Circle Games and employee Mr. Han, and other NetEase employees, who in defaming Plaintiffs, acted at all relevant times within the course and scope of their work for Crop Circle and NetEase and its affiliates.

## 171.

As a result of Defendants' defamatory statements, Plaintiffs have suffered ascertainable losses for which they are entitled to recover monetary damages, including but not limited to loss of business opportunities, damages to their good will, reputation, and esteem in the industry, reasonable attorneys' fees and court costs.

## COUNT II— UNFAIR TRADE PRACTICES

### 172.

Plaintiffs re-allege and incorporate all allegations set forth in the preceding paragraphs, as if fully set forth herein.

### 173.

To the extent the allegations in this Count are inconsistent with the allegations contained in any other Count, such allegations are pled in the alternative.

### 174.

Pursuant to La. R.S. 51:1405, unfair methods of competition and unfair or deceptive acts of practices in the conduct of any trade or commerce are unlawful.

### 175.

The Defendants have made and published unsupported, false, and defamatory statements against Plaintiffs regarding fraudulent conduct, mismanagement of a business, and dishonesty allegedly committed in their management of Crop Circle Games.

### 176.

These statements were made and published to former, current, or prospective customers of, and potential investors in, Crop Circle Games, Prytania Media, and Annie and Jeff Strain's other gaming business interests, all to the direct damage and prejudice of all Plaintiffs.

### 177.

Defendants' actions of accusing Prytania Media and the Strains of financial mismanagement of their business, fraud and other illegal conduct—without any evidentiary support whatsoever—are deceptive, unscrupulous, unfair, unethical, and oppressive and constitute unfair trade practices individually and together form a pattern of unfair trade practices under the Louisiana Unfair Trade Practices Act ("LUTPA"), La. R.S. 51:1401, *et seq.*

### 178.

Defendants' actions were not undertaken to protect legitimate business interests, but instead to damage Plaintiffs because they threatened NetEase's planned expansion of its game development business in the United States. Plaintiffs, who are in the business of creating and

managing game studios, were in direct competition with NetEase in the market and could speak out about NetEase's potential illegality involving its financial investments in the United States.

179.

In harming the reputation of Prytania Media and its founders, Defendants acted in contravention of the well-established strong public policy in Louisiana disfavoring restraints on trade and have engaged in conduct that constitutes unfair trade practices in violation of LUTPA.

180.

Defendants engaged in the aforementioned conduct with malice and with the intent of injuring competition in Louisiana, and elsewhere.

181.

In addition, under principles of *respondeat superior* Crop Circle Games and NetEase and its affiliates are liable *in solido* for the actions of their director on the Board of Directors of Crop Circle Games as well as employee Mr. Han and other NetEase employees, who acted at all relevant times within the course and scope of their work for Crop Circle Games and NetEase and its affiliates.

182.

As a result of Defendants' unfair trade practices, which specifically include publishing in bad faith the incorrect and defamatory allegations that Plaintiffs engaged in fraudulent conduct and mis-managed Crop Circle Games, Plaintiffs have suffered ascertainable losses, including but not limited to loss of business opportunities, damages to their good will, reputation, and esteem in the industry, for which they are entitled to recover monetary damages, treble damages, reasonable attorneys' fees and court costs.

183.

Finally, the Defendants' actions continue to harm the Plaintiffs and are unlawful under the Louisiana Unfair Trade Practices Act. As such, Plaintiffs are entitled to an injunction prohibiting the Defendants from further, negative communications with third parties.

## COUNT III— TORTIOUS INTERFERENCE
## WITH BUSINESS RELATIONS

### 184.

Plaintiffs re-allege and incorporate all allegations set forth in the preceding paragraphs, as if fully set forth herein.

### 185.

To the extent the allegations in this Count are inconsistent with the allegations contained in any other Count, such allegations are pled in the alternative.

### 186.

Defendants have made and published unsupported, false, and defamatory statements against Plaintiffs regarding fraudulent conduct, mismanagement of a business, and dishonesty allegedly committed in their management of Crop Circle Games.

### 187.

These statements were published to former, current, or prospective customers of Crop Circle Games, Prytania Media and Annie and Jeff Strain.

### 188.

Defendants had no basis to believe the statements were true and had constructive as well as direct knowledge of the statements' falsity.

### 189.

The tortious, defamatory and unfair statements and practices detailed above were not undertaken by Defendants to protect the legitimate business interests of Defendants. Instead, Defendants' actions in interfering with Plaintiffs' business relations were undertaken knowingly and were intended to damage Plaintiffs, as well as to discredit and cover up the Strains' concerns about the legality of NetEase's financial investments in the United States.

### 190.

The statements were made with actual malice for the purpose of damaging the Plaintiffs' reputation and dissuading other from dealing with Plaintiffs.

191.

Plaintiffs were thereby prevented from doing business with various third-party investors, clients and other companies in the gaming industry.

192.

In addition, under principles of *respondeat superior* Crop Circle Games and NetEase and its affiliates are liable *in solido* for the actions of their director on the Board of Directors of Crop Circle Games and employee, Mr. Han, and other NetEase employees under their control in tortiously interfering with Plaintiffs' business relations in violation of Louisiana law, because, *inter alia,* Mr. Han's and other NetEase employees' actions as alleged herein were undertaken within the course and scope of their work for Crop Circle and NetEase and its affiliates.

193.

As a result of the Defendants' tortious interference, which specifically includes the bad faith allegations that plaintiffs fraudulently managed Crop Circle Games, Plaintiffs have suffered ascertainable losses for which they are entitled to recover monetary damages, including but limited to loss of business opportunities, damages to their good will, reputation, and esteem in the industry, reasonable attorneys' fees and court costs.

## **COUNT IV— NEGLIGENCE UNDER ARTICLE 2315**

194.

Plaintiffs re-allege and incorporate all allegations set forth in the preceding paragraphs, as if full set forth herein.

195.

To the extent the allegations in this Count are inconsistent with the allegations contained in any other Count, such allegations are pled in the alternative.

196.

Article 2315 of the Civil Code broadly provides that any act that causes damage to another is compensable.

197.

In this matter, the allegations of the paragraphs above establish that the Defendants'

actions, both directly and through persons under their control, have caused significant damages to

Plaintiffs.

198.

Therefore, the Defendants are liable to the Plaintiffs under article 2315 for any damages

caused by their actions.

## JURY DEMAND

Plaintiffs further pray for a trial by jury on all matters triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that, after due proceedings are hard, this Court render a

judgment in their favor and against Defendants, for all damages and injunctive relief available

under law to which they prove to be entitled, including attorneys' fees, costs, and prejudgment

interest upon all amounts awarded to Plaintiffs herein from the date of judicial demand.

Respectfully submitted,

**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**

BY: _____

STEVEN F. GRIFFITH, JR. (27232)
MATTHEW S. CHESTER (36411)
RILEY T. SVIKHART (40647)
SOPHIA R. CEFOLIA (41188)
201 St. Charles Avenue, Suite 3600
New Orleans, Louisiana 70170
Telephone: (504) 566-5200
Facsimile: (504) 636-4000
Email:   sgriffith@bakerdonelson.com
         mchester@bakerdonelson.com
         rsvikhart@bakerdonelson.com
         scefolia@bakerdonelson.com

**ATTORNEYS FOR ALL PLAINTIFFS**

**PLEASE SERVE:**
**CROP CIRCLE GAMES CORP.**
**(In the Absence of a Registered Agent,**
**Through the Louisiana Secretary of State)**
**Louisiana Secretary of State**
**8585 Archives Ave.**
**Baton Rouge, Louisiana 70809**

**HOLD SERVICE ON OTHER DEFENDANTS AT THIS TIME**

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

CASE NO. 2025-22                                           SECTION "I"

**PRYTANIA MEDIA LLC; PRYTANIA MEDIA CORP;**
**ANNIE STRAIN; and WILLIAM ("JEFF") STRAIN**

**VERSUS**

**NETEASE, INC.;**
**NETEASE INTERACTIVE ENTERTAINMENT PTE. LTD.;**
**NETEASE INFORMATION TECHNOLOGY CORPORATION;**
**HAN CHENGLIN; and CROP CIRCLE GAMES CORP**

FILED: _____        _____
                                                              **DEPUTY CLERK**

**VERIFICATION**

**STATE OF LOUISIANA**

**PARISH OF ORLEANS**

        BEFORE ME, the undersigned Notary Public, duly commissioned and qualified in and for

the State and Parish aforesaid, therein residing, personally came and appeared:

**PRYTANIA MEDIA LLC**

and, upon first being duly sworn by me, Notary, did depose and say that it is the Plaintiff in the

captioned matter, and as such has personal knowledge of the facts alleged therein; that it (through

the Officer identified below) has read the above and foregoing Amended Petition and that all of

the facts and allegations contained therein are true and correct to the best of its knowledge,

information and belief.

SWORN TO AND SUBSCRIBED
BEFORE ME, NOTARY, THIS /8ᵗʰ
DAY OF _February_, 2025.

By: _____
Name: William ("Jeff") Strain
On Behalf of Prytania Media Corp
As Manager of Prytania Media LLC

_____
NOTARY PUBLIC   # 38255

NOTARY ID NO. 38255
TRACY N. ST. UPERY · NOTARY · PUBLIC · IBERIA PARISH, LA



**VERIFIED**

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

CASE NO. 2025-22                                        SECTION "I"

PRYTANIA MEDIA LLC; PRYTANIA MEDIA CORP;
ANNIE STRAIN; and WILLIAM ("JEFF") STRAIN

VERSUS

NETEASE, INC.;
NETEASE INTERACTIVE ENTERTAINMENT PTE. LTD.;
NETEASE INFORMATION TECHNOLOGY CORPORATION;
HAN CHENGLIN; and CROP CIRCLE GAMES CORP

FILED: _____          _____
                                        DEPUTY CLERK

## VERIFICATION

STATE OF LOUISIANA

PARISH OF ORLEANS

BEFORE ME, the undersigned Notary Public, duly commissioned and qualified in and for

the State and Parish aforesaid, therein residing, personally came and appeared:

ANNIE STRAIN

and, upon first being duly sworn by me, Notary, did depose and say that she is the Plaintiff in the

captioned matter, and as such has personal knowledge of the facts alleged therein; that she has read

the above and foregoing Amended Petition and that all of the facts and allegations contained

therein are true and correct to the best of her knowledge, information and belief.

SWORN TO AND SUBSCRIBED          By _____
BEFORE ME, NOTARY, THIS 18th      Name:  Annie Strain
DAY OF February, 2025.

_____
NOTARY PUBLIC   # 38255



VERIFIED

FILED

2025 FEB 20 PM 3: 34

CIVIL
DISTRICT COURT

## CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

### STATE OF LOUISIANA

**CASE NO. 2025-22**                                        **SECTION "I"**

### PRYTANIA MEDIA LLC; PRYTANIA MEDIA CORP; ANNIE STRAIN; and WILLIAM ("JEFF") STRAIN

### VERSUS

### NETEASE, INC.; NETEASE INTERACTIVE ENTERTAINMENT PTE. LTD.; NETEASE INFORMATION TECHNOLOGY CORPORATION; HAN CHENGLIN; and CROP CIRCLE GAMES CORP

FILED: _____          _____
                                                **DEPUTY CLERK**

### VERIFICATION

**STATE OF LOUISIANA**

**PARISH OF ORLEANS**

BEFORE ME, the undersigned Notary Public, duly commissioned and qualified in and for

the State and Parish aforesaid, therein residing, personally came and appeared:

### WILLIAM ("JEFF") STRAIN

and, upon first being duly sworn by me, Notary, did depose and say that he is the Plaintiff in the

captioned matter, and as such has personal knowledge of the facts alleged therein; that he has read

the above and foregoing Amended Petition and that all of the facts and allegations contained

therein are true and correct to the best of his knowledge, information and belief.

SWORN TO AND SUBSCRIBED             By: _____
BEFORE ME, NOTARY, THIS _18th_        Name: William Strain
DAY OF _February_, 2025.

_____
NOTARY PUBLIC  # 38255



VERIFIED

**CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS**

**STATE OF LOUISIANA**

CASE NO. 2025-22                                             SECTION "I"

**PRYTANIA MEDIA LLC; PRYTANIA MEDIA CORP;
ANNIE STRAIN; and WILLIAM ("JEFF") STRAIN**

**VERSUS**

**NETEASE, INC.;
NETEASE INTERACTIVE ENTERTAINMENT PTE. LTD.;
NETEASE INFORMATION TECHNOLOGY CORPORATION;
HAN CHENGLIN; and CROP CIRCLE GAMES CORP**

FILED: _____                 _____

                                                                 **DEPUTY CLERK**

**VERIFICATION**

**STATE OF LOUISIANA**

**PARISH OF ORLEANS**

 BEFORE ME, the undersigned Notary Public, duly commissioned and qualified in and for

the State and Parish aforesaid, therein residing, personally came and appeared:

**PRYTANIA MEDIA CORP**

and, upon first being duly sworn by me, Notary, did depose and say that it is the Plaintiff in the

captioned matter, and as such has personal knowledge of the facts alleged therein; that it (through

the Officer identified below) has read the above and foregoing Amended Petition and that all of

the facts and allegations contained therein are true and correct to the best of its knowledge,

information and belief.

SWORN TO AND SUBSCRIBED
BEFORE ME, NOTARY, THIS /8 ʸᵗʰ
DAY OF _February_, 2025.

By: _____
Name:  William ("Jeff") Strain
As Chief Executive Officer
Prytania Media Corp

_____
NOTARY PUBLIC     # 38255

